## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Goodbye Vanilla, LLC, | Case No. _____ |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT** |
| Aimia Proprietary Loyalty U.S. Inc., and Aimia, Inc., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Goodbye Vanilla, LLC brings this Complaint for unfair competition, deceptive trade practices, misappropriation of trade secrets, breach of joint venture agreement, breach of contract, promissory estoppel, unjust enrichment, breach of fiduciary duties as joint venturers, and injunctive relief against Defendants Aimia Proprietary Loyalty U.S. Inc. and Aimia, Inc. (collectively "Defendants"):

## I.  INTRODUCTION

1.      In order to take advantage of a lucrative opportunity, Defendants needed something Plaintiff had – specific proprietary and confidential information, knowledge, and industry contacts.  Defendants committed to sharing the benefits they could obtain only with Plaintiff's help, but when it came time to make good on that commitment, Defendants refused to do so.

2.      On or about August 2014, Plaintiff and Defendants entered into a joint venture to submit a proposal to Sony Pictures Entertainment ("Sony") in an attempt to secure a contract with Sony related to management of Sony's Wheel of Fortune loyalty program.[1]

3.      Plaintiff possesses key industry expertise, contacts, references, knowledge and understanding that were crucial to Defendants' purposes. In exchange for Plaintiff's industry expertise and key references and contacts in the entertainment, media, and television industries, which proved to be crucial to the parties' proposal to Sony, Defendants promised Plaintiff, among other things, a revenue-generating role (equivalent to at least Three Hundred Thousand and no/100 Dollars ($300,000.00)) in any agreement the parties were able to secure with Sony, plus an opportunity for at least Five Hundred Thousand and no/100 Dollars ($500,000.00) in additional revenue related to the Sony deal.

4.      The parties were successful in their joint venture, and Sony agreed to award the loyalty program contract to them.  Plaintiff was instrumental in helping Defendants build a relationship with Sony and ultimately securing the contract with Sony.

---

[1] Wheel of Fortune is an American television game show featuring contestants who compete to solve word puzzles and win cash and prizes by spinning a giant carnival wheel.  Wheel of Fortune boasts being the "most successfully syndicated show" on television, since it first premiered on January 6, 1975.  *See* Wheel of Fortune, http://www.wheeloffortune.com (last visited Oct. 15, 2015).

5.      After receiving the news that Sony planned to award them the contract, Defendants undertook a calculated course of conduct designed to squeeze Plaintiff out of the final deal and keep all of the revenue from the Sony contract for themselves. Upon information and belief, Defendants now stand in a position to secure additional contracts with Sony valued at more than Fifteen Million and no/100 Dollars ($15,000,000.00).    Although Plaintiff's proprietary information and work product proved instrumental in Defendants' success, Plaintiff was not given a part in any of these contracts, never provided the revenue-generating role promised to it, and, even after Defendants acknowledged an obligation to pay Plaintiff for its efforts, only compensated a partial expense reimbursement of Seventeen Thousand Six Hundred Twenty Five and no/100 Dollars ($17,625.00).

6.      Defendants continue to use and disclose Plaintiff's proprietary and confidential information for their own benefit, to the detriment of Plaintiff, in violation of the parties' written nondisclosure agreement and Federal and State law.  Plaintiff has suffered and continues to suffer irreparable harm as a result of Defendants' actions.

7.      Accordingly, Plaintiff seeks injunctive relief enjoining Defendants from improperly using and disclosing Plaintiff's proprietary and confidential information and trade secrets, as well as a judgment against Defendants in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus statutory interest on all accrued claims, Plaintiff's costs,

3

disbursements, and reasonable attorney fees, and such other and further relief as this Court may deem just and equitable.

## II. PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff, at all times material hereto, was and is a limited liability company organized and existing pursuant to the laws of the State of Minnesota, with offices and its principal place of business located at 4828 West 35th Street in Minneapolis, Minnesota 55416.

9.     Upon information and belief, Defendant Aimia Proprietary Loyalty U.S. Inc., at all times material hereto, was and is a corporation incorporated and existing pursuant to the laws of the State of Delaware, and doing business in the State of Minnesota, with a registered office located at 100 South 5th Street #1075 in Minneapolis, Minnesota 55402.

10.     Upon information and belief, Defendant Aimia Proprietary Loyalty U.S. Inc. is a subsidiary of, or similarly affiliated with, Defendant Aimia, Inc., a global company with its headquarters located at 525 Viger Avenue West, Suite 1000, in Montreal, Quebec, Canada H2Z 0B2.

11.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Diversity of citizenship exists because Plaintiff is a Minnesota limited liability company and, upon information and belief, Defendant Aimia Proprietary Loyalty U.S. Inc. is a Delaware corporation and Defendant Aimia, Inc., is a global company headquartered in

Canada. The amount in controversy is in excess of Seventy Five Thousand and no/100

Dollars ($75,000.00).

12.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331,

because Plaintiff alleges federal claims raising federal questions under the Lanham Act

§ 43(a), 15 U.S.C. § 1125(a), and related federal common law.

13.     This Court has supplemental jurisdiction over any state law claims alleged

herein pursuant to  28 U.S.C. § 1367, because those claims are so related to the federal

claims that they form part of the same case or controversy.

14.     This Court has personal jurisdiction over the parties and is the proper

venue for this action by virtue of the fact that both Plaintiff and Defendants have offices

in Minneapolis; a substantial part of the events or omissions giving rise to Plaintiff's

claims occurred in Minnesota; and Minnesota is the most convenient venue for the

parties and witnesses and the venue that best serves the interests of justice.  Moreover,

the parties have already expressly agreed in Section 14.0 of their Mutual Nondisclosure

Agreement, a copy of which is attached to this Complaint as Exhibit A and incorporated

here by reference, that a federal court situated in Hennepin County, Minnesota, would

be the appropriate venue for this matter.

## III.  FACTUAL ALLEGATIONS

15.     Plaintiff is in the business of, among other things, providing unique and cutting edge marketing and brand development products and services, including consulting services.

16.     Upon information and belief, Defendants are in the business of, among other things, managing various "customer loyalty" programs and systems for a variety of clients.

17.     Upon information and belief, Sony sent a Request for Proposals (the "RFP") to various parties, including Defendants, on or about August 1, 2014, seeking proposals related to management of its Wheel of Fortune loyalty program.

18.     Defendants lacked the needed expertise for a successful proposal without the proprietary information and participation of Plaintiff.  Although Defendants were capable of producing product software for the Wheel of Fortune loyalty program, they needed Plaintiff to handle the "customer-facing" portion of the program, as Plaintiff alone possessed the necessary expertise in the entertainment, media, and television industries.   Without Plaintiff's contribution to the "customer-facing" portion, Defendants would not have been able to develop and produce product software meeting Sony's RFP.

19.     Furthermore, Defendants had laid off or reassigned a huge portion of their marketing team during the RFP pitch process. As a result, Defendants leaned more heavily on Plaintiff's marketing skills and expertise.

20.     Recognizing their inability to provide a successful presentation without Plaintiff, Defendants approached Plaintiff with the offer to work jointly to prepare and submit a proposal in response to Sony's RFP and ultimately pursue a contract with Sony. Plaintiff agreed to work jointly with Defendants in this regard, and in fact, Defendants consistently referred to Plaintiff as their "partner" in various presentations to Sony.

21.     The parties agreed that Plaintiff's contribution to the joint venture would be, among other things, to provide ongoing expertise and consulting services (both in preparation of the parties' proposal and, in the event the parties were awarded the Sony contract, for the term of the Sony contract) regarding television and entertainment marketing strategies, programs, and systems. Plaintiff also provided research and advice regarding best practices in the television and entertainment industries, as well as recommendations for improving consumer loyalty programs, engagement and viewership, and developing digital strategies.

22.     In exchange, Defendants promised Plaintiff that it would be compensated for its efforts in preparing the proposal to Sony and, if the parties were awarded the Sony contract, then Plaintiff would be guaranteed a revenue-generating role in the final

agreement with Sony. Plaintiff originally demanded a guaranteed revenue-generating role equivalent to Five Hundred Thousand and no/100 Dollars ($500,000.00), but it agreed to accept a revenue-generating role equivalent to Three Hundred Thousand and no/100 Dollars ($300,000.00), because Defendants assured Plaintiff that winning the Sony contract award would open up other revenue-generating opportunities for Plaintiff, estimated to provide an additional Five Hundred Thousand and no/100 Dollars ($500,000.00) in revenue over and beyond the Three Hundred Thousand and no/100 Dollars ($300,000.00) Plaintiff would be guaranteed with the Sony contract. This Three Hundred Thousand and no/100 Dollars ($300,000.00) figure was included in the parties' proposal and pitch to Sony.

23.     Moreover, Defendants promised Plaintiff that if the parties landed the Sony deal, Plaintiff would be open to a "ton of business" and would "be able to walk the halls" of Sony's much larger global company.

24.     The parties entered into a "Mutual Nondisclosure Agreement" on August 8, 2014[2], which provides that the parties have a duty to protect and hold confidential any "proprietary and confidential information," including without limitation any information regarding a party's finances, research, development, business activities, products, services, or technical knowledge, received from the other party. The parties

---

[2] Plaintiff was never provided a fully executed copy of the parties' Mutual Nondisclosure Agreement, so the attached document only contains a signature for Plaintiff. However, Defendants have admitted in subsequent correspondence to Plaintiff that they did in fact execute the Mutual Nondisclosure Agreement on August 8, 2014.

must not improperly disclose said information to third parties or infringe upon the ownership rights of the party to whom said information belongs.

25.     Section 11.0 of the Mutual Nondisclosure Agreement provides an express acknowledgment by the parties that each party's proprietary and confidential information "has been developed by the Disclosing Party with substantial effort and at substantial cost"; that breach of the Mutual Nondisclosure Agreement "will cause the Disclosing Party irreparable injury for which no adequate remedy at law exists"; and therefore, either party has the right to seek a temporary or permanent restraining order or injunction from a court of competent jurisdiction to enjoin any such breach or enforce the parties' Mutual Nondisclosure Agreement.

26.     In reliance on Defendants' promises, Plaintiff immediately began working to prepare the parties' proposal for Sony.  From approximately August 15, 2014, to December 4, 2014, Plaintiff invested a significant amount of time and expense in preparing the parties' proposal to Sony.  Plaintiff incurred thousands of dollars in out-of-pocket expenses, including expenses Plaintiff incurred when Drew Pearson, its chief executive officer (CEO), flew to Los Angeles to present an in-person pitch to Sony.

27.     Throughout the proposal process, Plaintiff was instrumental in helping Defendants build a relationship with Sony and in ultimately receiving the contract award from Sony.  Plaintiff contributed critical subject-matter expertise, industry credibility, and real case experience that Defendants did not have.  Without Plaintiff's

contribution, Defendants would not have had a seat at the table or been considered a real contender in the Sony RFP process.

28.     Among other things, Plaintiff contributed an impressive reference from a top television industry executive to the list of references included in the parties' proposal to Sony. This was the only television reference on the list – a reference the Defendants did not have on their own, but needed in order to establish credibility and secure the Sony contract award.

29.     Drew Pearson (Plaintiff's CEO) also had a strong relationship and good reputation with Sony, as he had previously worked with Sony's music division in New York.

30.     The parties agreed that Plaintiff should use its industry contacts to engage third party consultants who could aid in the development and presentation of a proposal meeting Sony's RFP. Relying upon Defendants' promises, Plaintiff, at its own cost and expense, engaged third party consultants to assist in the preparation of the parties' proposal. One of the third party consultants Plaintiff engaged was a former top-level executive for Sony, who was able to provide the parties with invaluable information based on the consultant's own experience at Sony.

31.     At the request of Defendants, Plaintiff, at its own cost and expense, used its industry contacts to set up and conduct interviews with three top-level executives at ABC, Fox, and Sony. Through these interviews, the parties gathered important insights

into Sony's existing tools, platforms, and partners, as well as important rating information and strategies related to Nielsen Data Fusion. Plaintiff also gathered critical information regarding current television metrics and recommendations for how these metrics should be incorporated into Defendants' product software. Plaintiff shared this information with Defendants in order to further the ultimate goal of the parties' joint venture – securing the Sony contract award.

32.     Throughout the Sony RFP process, Plaintiff responded to numerous requests and questions from Sony since Defendants lacked the expertise and knowledge needed to appropriately respond. Plaintiff drafted many of the written responses that Defendants ultimately submitted in response to Sony's questions. Plaintiff worked overtime to provide quick responses to Sony's questions, achieving a 24-hour turnaround time in most cases.

33.     Plaintiff collaborated with Defendants to develop recommendations for Sony. Plaintiff's contributions in this regard included full, detailed suggested approaches based upon Plaintiff's research, insights, and experience in the industry.

34.     Plaintiff also conducted several ad-hoc research studies in response to specific questions or strategy needs related to the parties' proposal to Sony.

35.     Plaintiff spent significant amounts of time and effort educating Defendants' staff and consultants on the nature of the television industry. Without

Plaintiff, Defendants would have appeared to Sony to be unqualified, as Defendants lacked even basic knowledge about the television industry.

36.     Throughout the entire Sony RFP process, Defendants relied heavily on Plaintiff's industry expertise and know-how.  Defendants called or emailed the Plaintiff on nearly a daily basis seeking recommendations, direction, and answers to questions from Sony.

37.     On December 4, 2014, the parties were notified that they had been awarded the Sony contract.

38.     An email from a senior level executive of Defendants dated December 4, 2014, indicates that Sony appreciated that Defendants brought in Plaintiff as "a partner agency" to address the "fact that TV/Entertainment is not an area of expertise" for Defendants.  The same email also indicated that Sony was very impressed with the in-person pitch of Drew Pearson (Plaintiff's CEO) and greatly valued his portion of the presentation.

39.     On multiple occasions, Sony indicated to Defendants that Plaintiff was critical to their success.  During the in-person pitch, Sony informed Defendants that they were "very lucky to have Drew here," referring to Drew Pearson (Plaintiff's CEO).

40.     Defendants themselves acknowledged that they would not have been able to respond to Sony's RFP in any meaningful manner, much less actually secure the Sony contract award, without Plaintiff's help.   In fact, Defendants' vice president of

marketing told Drew Pearson (Plaintiff's CEO): "If it weren't for winning this project, I would have been cut with the other [marketing employees who were laid off]."

41.    From the beginning of their discussions, Plaintiff and Defendants had agreed to act jointly, present their proposal to Sony as co-partners, and in the event the Sony contract was awarded, to work as partners in performing and delivering under the Sony contract. Defendants later told Plaintiff that Sony was open to this co-partner approach but wanted "a single point of contact and billing." The parties agreed that Defendants would serve as the single point of contact and billing for Sony. Defendants' role as the single point of contact and billing for Sony ended up becoming a critical tool in Defendants' efforts to squeeze Plaintiff out of the Sony deal. Upon information and belief, Defendants' insistence in serving as the single point of contact and billing for Sony was all part of Defendants' calculated efforts to use Plaintiff to secure the Sony deal and then discard Plaintiff in order to reap all the benefits for themselves.

42.    Utilizing their role as the single point of contact and billing for Sony, Defendants presented Plaintiff's significant contributions to the parties' proposal – including valuable proprietary information and work product belonging to the Plaintiff – as though they were the Defendants' own contributions. Thus, Defendants abused and manipulated their role as the single point of contact to Sony in order to lead Sony to wrongfully believe that Plaintiff's proprietary information and work product actually belonged to, and was produced by, Defendants. Upon information and belief,

Defendants' wrongful actions in this regard made it possible for Defendants to convince Sony that Plaintiff was a dispensable consultant that could be cut out of the final deal.

43.     From approximately January 23, 2015, to February 13, 2015, the parties participated in various meetings and preparations with Sony, which culminated with a three-day "client kickoff" in Los Angeles.   Plaintiff, at its own expense, flew Drew Pearson (its CEO) to Los Angeles to attend the kickoff.

44.     Around this time, Sony introduced the idea of expanding the contract scope beyond Wheel of Fortune to include a similar program for Jeopardy[3] and an affiliate loyalty program for localized television stations.   This expansion would significantly increase the potential revenue stream from the Sony contract.   Plaintiff worked directly with Sony executives to develop ideas and direction for the additional Jeopardy and affiliate loyalty programs.

45.     Shortly after the three-day Wheel of Fortune "client kickoff" in Los Angeles, the relationship between Plaintiff and Defendants began to break down.   The break down occurred because Defendants started withholding information regarding the Sony deal from Plaintiff, stopped timely responding to Plaintiff's emails and other communications, and upon information and belief, were intentionally engaged in a

---

[3] Jeopardy is an American television game show featuring contestants who compete to win money using their knowledge of general trivia.  Clues are given in the form of answers, and the contestants must phrase their responses in the form of questions.   *See* Jeopardy, http://www.jeopardy.com (last visited Oct. 27, 2015).

calculated course of conduct designed to keep Plaintiff out of the loop and eventually squeeze Plaintiff out of the final Sony deal.

46.     Among other things, Defendants removed Plaintiff from the parties' shared "Dropbox" folder, which the parties used to share and review information and documents internally before submitting them to Sony, as well as the parties' shared "Basecamp" platform, which the parties used for communications, asset sharing, and project management.

47.     On March 13, 2015, Defendants asked Plaintiff to put its work related to the Sony deal "on hold until further notice."

48.     Defendants have continued to work with Sony, but have excluded Plaintiff from all negotiations and discussions with Sony since approximately March 13, 2015.

49.     Upon information and belief, Defendants have used, and continue to use without any authorization or approval from Plaintiff, Plaintiff's proprietary information, industry expertise, and work product in their dealings with Sony and others.   Defendants are wrongfully palming off Plaintiff's proprietary information, industry expertise, and work product as their own.

50.     On or about March 25, 2015, Defendants admitted in a letter to Plaintiff that they had agreed to work as co-partners with Plaintiff to make the Sony proposal and pitch and had promised Plaintiff a revenue-generating role in the event they were

awarded the Sony contract. Despite these admissions and their acknowledgment that they were obligated to pay Plaintiff, Defendants only paid Plaintiff Seventeen Thousand Six Hundred Twenty Five and no/100 Dollars ($17,625.00) as partial reimbursement for the out-of-pocket expenses Plaintiff had incurred to date, before inexplicably refusing to make any further payments to Plaintiff. *Id.*

51.     On May 14, 2015, Defendants emailed Plaintiff indicating that Sony was no longer willing to contract for Plaintiff's services as presented in the parties' original proposal, and insisted that Plaintiff continue to keep its work "on hold to avoid incurring costs that may not be covered by the client." To date, Defendants have not instructed Plaintiff to resume any work pursuant to the Sony deal.

52.     Upon information and belief, after Defendants squeezed Plaintiff out of the Sony deal, they brought on two new strategy consultants who were already under contract with Defendants in order to reduce Defendants' cost and increase Defendants' revenue, and then entered into contracts with Sony potentially providing for more than Fifteen Million and no/100 Dollars ($15,000,000.00) in revenue to Defendants. By cutting Plaintiff out of the deal and bringing on two different consultants, Defendants greatly increased their profits from the Sony contracts. To date, Plaintiff has not received any payments from Sony or Defendants, except for the Seventeen Thousand Six Hundred Twenty Five and no/100 Dollars ($17,625.00) partial expense reimbursement the Defendants paid to Plaintiff sometime on or about March 15, 2015.

53.     Defendants are continuing to improperly use and disclose Plaintiff's proprietary and confidential information for their own benefit, to the detriment of Plaintiff and in violation of the parties' Mutual Nondisclosure Agreement, Plaintiff's ownership rights in the information, and Federal and State laws.

## IV.  STATEMENT OF CLAIM

### COUNT I:
### FEDERAL UNFAIR COMPETITION
### (Violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a))

54.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

55.     Defendants have used and continue to use Plaintiff's words, terms, names, symbols, or devices, or a combination thereof, in such a way that it is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' goods or services or commercial activities by Plaintiff, in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a), and common law.

56.     In addition, Defendants' continued use of Plaintiff's words, terms, names, symbols, or devices, or a combination thereof, is a false designation of origin, false or misleading description of fact, and a false or misleading representation of fact, in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a), and common law.

57.     Defendants have, and continue to, palm off Plaintiff's work product, industry expertise, and proprietary information as their own.

58.      Defendants' unfair competition has caused, and will continue to cause, Plaintiff to suffer irreparable harm unless Defendants' actions are enjoined.  Plaintiff is entitled to seek, and does in fact seek in Count IX of this Complaint, an injunction enjoining Defendants' unfair competition, which is causing irreparable harm to Plaintiff, plus any other further relief that the Court deems just and equitable.

59.     Defendants have profited from their unlawful actions and have been unjustly enriched to the detriment of Plaintiff.  Plaintiff is entitled to a judgment against Defendants for their violation of the Lanham Act and related federal law in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

## COUNT II:
## DECEPTIVE TRADE PRACTICES
**(Violation of Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*)**

60.      Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

61.      Defendants have, and continue to, palm off Plaintiff's goods and services as their own.

62.     Defendants have acted, and continue to act, in such a way that is likely to cause confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services.

63.     Defendants have acted, and continue to act, in such a way that is likely to cause confusion or misunderstanding as to their affiliation, connection, association with, or certification by Plaintiff.

64.     In wrongfully using the sponsorship, approval, characteristics, status, affiliation, or connection of Plaintiff's goods and services, Defendants have misrepresented, and continue to misrepresent, that their goods and services have sponsorship, approval, or characteristics, status, affiliation, or connection that they do not actually have.

65.     Defendants have engaged, and continue to engage, in other conduct which similarly creates a likelihood of confusion and misunderstanding.

66.     Defendants' actions are a violation of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*

67.     Defendants' deceptive trade practices have caused, and will continue to cause, Plaintiff to suffer irreparable harm unless Defendants' actions are enjoined. Plaintiff is entitled to seek, and does in fact seek in Count IX of this Complaint, an injunction enjoining Defendants' deceptive trade practices, which are causing

irreparable harm to Plaintiff, plus any other further relief that the Court deems just and equitable.

68.     Furthermore, Plaintiff is entitled to a judgment against Defendants for Plaintiff's costs and attorney fees pursuant to Minn. Stat. § 325D.45.

## COUNT III:
## MISAPPROPRIATION OF TRADE SECRETS
### (Violation of Uniform Trade Secrets Act, Minn. Stat. § 325C.01, *et seq.*)

69.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

70.     Through their joint venture with Plaintiff, Defendants acquired certain confidential information and trade secrets of Plaintiff related to Plaintiff's expertise in the entertainment, media, and television industries.

71.     Such confidential information and trade secrets have independent economic value and were not generally known to or readily ascertainably by persons outside of Plaintiff.

72.     After cutting Plaintiff out of the Sony deal, Defendants wrongfully continued to disclose and use Plaintiff's confidential information and trade secrets, without the express or implied consent of Plaintiff, for Defendants' own profit and benefit to the detriment of Plaintiff.

73.     Defendants' misappropriation of Plaintiff's confidential information and trade secrets have caused, and will continue to cause, Plaintiff to suffer irreparable

harm unless Defendants' actions are enjoined. Plaintiff is entitled to seek, and does in fact seek in Count IX of this Complaint, an injunction enjoining Defendants' misappropriation of Plaintiff's confidential information and trade secrets, which is causing irreparable harm to Plaintiff, plus any other further relief that the Court deems just and equitable.

74.     Defendants have profited from their unlawful actions and have been unjustly enriched to the detriment of Plaintiff.  Plaintiff is entitled to a judgment against Defendants for their violation of the Uniform Trade Practices Act and related law in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

**COUNT IV:**
**BREACH OF CONTRACT**
**Mutual Nondisclosure Agreement**

75.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

76.     The parties entered into a contract through the exchange of promises in the form of a Mutual Nondisclosure Agreement.

77.     The parties' Mutual Nondisclosure Agreement imposes a duty upon Defendants to protect and hold confidential certain "proprietary and confidential information," as such information is described above and in the attached Exhibit A,

belonging to Plaintiff.   The Mutual Nondisclosure Agreement expressly prohibits Defendants from improperly using or disclosing Plaintiff's proprietary and confidential information to third parties.

78.     Defendants continue to improperly use and disclose Plaintiff's proprietary and confidential information for their own benefit, to the detriment of Plaintiff and in direct violation of the parties' Mutual Nondisclosure Agreement.

79.     Defendants' actions constitute a breach of the parties' Mutual Nondisclosure Agreement.

80.     Plaintiff has suffered irreparable injury as a result of Defendants' breach of the parties' Mutual Nondisclosure Agreement.

81.     The parties' expressly agreed in Section 11.0 of their Mutual Nondisclosure Agreement that one party's breach of the Mutual Nondisclosure Agreement will cause the non-breaching party to suffer "irreparable injury for which no adequate remedy at law exists," and therefore, the non-breaching party has a right to seek a court order enjoining the breach.

82.     Accordingly, Plaintiff is entitled to seek, and does in fact seek in Count IX of this Complaint, an injunction enjoining Defendants' continued breach of the parties' Mutual Nondisclosure Agreement, which is causing irreparable harm to Plaintiff, plus any other further relief that the Court deems just and equitable.

## COUNT V:
## BREACH OF JOINT VENTURE AGREEMENT

83.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

84.     Plaintiff and Defendants entered into a joint venture agreement for the purpose of obtaining business from Sony, wherein the parties agreed to cooperatively pursue mutual profit.

85.     Among the understandings reflected in, and incident to, the parties' joint venture agreement were the following:

    a.    Plaintiff agreed to provide confidential and proprietary information, skill, expertise, research, advice, recommendations, and other efforts to meet Sony's RFP.

    b.    Defendants agreed to compensate Plaintiff for its efforts in assisting with the preparation of a proposal meeting Sony's RFP and, in the event the parties were awarded the Sony contract, Defendants guaranteed Plaintiff a revenue-generating role in the final agreement equivalent to at least Three Hundred Thousand and no/100 Dollars ($300,000.00), plus an opportunity for at least Five Hundred Thousand and no/100 Dollars ($500,000.00) in additional revenue related to the Sony deal.

    c.    Defendants agreed that Plaintiff should engage consultants and expend efforts toward the joint development and presentation of a proposal meeting Sony's RFP.

86.     Plaintiff performed all of its obligations pursuant to the parties' joint venture agreement, until the time when Defendants unjustifiably demanded that Plaintiff cease all of its efforts in this regard.

87.     Defendants violated the parties' joint venture agreement by, among other things, failing to provide Plaintiff with a revenue-generating role in the final agreement with Sony, using Plaintiff's work and property for their own benefit, and keeping all of the benefit of the joint venture for themselves.

88.     Defendants intentionally engaged in a calculated course of conduct designed to manipulate the joint venture for their own use and benefit, in direct violation of the parties' agreement.

89.     Plaintiff has sustained direct and proximate damages as a result of Defendants' wrongful actions in this regard.

90.     Accordingly, Plaintiff is entitled to a judgment against Defendants for their breach of the parties' joint venture agreement in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

## COUNT VI:
## BREACH OF FIDUCIARY DUTIES AS JOINT VENTURER

91.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

92.     Plaintiff and Defendants, by virtue of their relationship as joint venturers, and otherwise at law, owed fiduciary duties to each other, as well as to their ongoing

business organizations, to conduct themselves and their affairs with the highest degree of care and honesty.

93.     These fiduciary duties were breached when Defendants, among other things, did not act honestly and in good faith with Plaintiff; manipulated the outcome of the joint venture exclusively for their own purposes and benefit, to the detriment of Plaintiff; and then, without due right, attempted to cancel the joint venture without satisfying the agreement of the parties.

94.     Plaintiff has suffered direct and proximate damages as a result of Defendants' conduct and resulting breaches of their fiduciary duties.

95.     Accordingly,  Plaintiff is entitled to a judgment against Defendants for their breach of their fiduciary duties as joint venturers in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

## COUNT VII:
## PROMISSORY ESTOPPEL

96.     Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

97.     Defendants made material representations to Plaintiff intended to induce action and cause Plaintiff to materially expend resources and act accordingly, including, but not limited to, promising Plaintiff that if the parties were awarded the Sony

contract, Plaintiff would be guaranteed a revenue-generating role in said contract and other related contracts with Sony valued at more than Fifteen Million and no/100 Dollars ($15,000,000.00).

98.     Defendants knew and intended for Plaintiff to reasonably rely upon their material representations.

99.     Plaintiff did reasonably rely on the material representations of Defendants.

100.    In reliance upon the representations, Plaintiff committed substantial resources, time, energy, and money to the furtherance of the supposedly joint purposes described by Defendants, and Plaintiff provided Defendants with the benefit they sought when they made their material representations to Plaintiff.

101.    As a result, Plaintiff was forced to forego other opportunities, expended substantial resources, and has been deprived of the benefit promised to it.  Plaintiff has suffered damages, including lost revenue, loss of proprietary information, and lost time.

102.    Accordingly, Plaintiff is entitled to a judgment against Defendants on the basis of promissory estoppel in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

## COUNT VIII:
## UNJUST ENRICHMENT

103.    Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

104.    Defendants were and are aware that but for Plaintiff's expertise, references and contacts in the television, media, and entertainment industries, as well as Plaintiff's significant efforts in the parties' joint venture to secure the Sony contract award, Defendants would not have been awarded the Sony contract, which, upon information and belief, could ultimately be worth more than Fifteen Million and no/100 Dollars ($15,000,000.00).

105.    Furthermore, Defendants were and are aware that Plaintiff is entitled to its co-partner share of the revenue Defendants are collecting from their contract with Sony, which share the parties' agreed would be at least Three Hundred Thousand and no/100 Dollars ($300,000.00) and sufficient to compensate Plaintiff for its efforts in pitching the proposal to, and securing a contract with, Sony.

106.    Despite this knowledge, Defendants have retained all of the revenue from the contract with Sony and used this money for their sole benefit and to the detriment of Plaintiff.

107.    Defendants are not entitled to retain said money, yet they wrongfully retain the same.

108.    Defendants have failed to convey said money to the Plaintiff.

109. Allowing Defendants to retain said money would constitute unjust enrichment.

110. Accordingly, Plaintiff is entitled to a judgment against Defendants on the basis of unjust enrichment in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus interest, costs and disbursements, reasonable attorney fees, and any other relief that the Court deems just and equitable.

**COUNT IX:**
**INJUNCTIVE RELIEF**

111. Plaintiff realleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as if set out fully here.

112. Plaintiff has suffered and continues to suffer irreparable harm due to Defendants' breach of the parties' Mutual Nondisclosure Agreement, and Federal and State laws.

113. The parties' expressly agreed in Section 11.0 of their Mutual Nondisclosure Agreement that one party's breach of the Mutual Nondisclosure Agreement will cause the non-breaching party to suffer "irreparable injury for which no adequate remedy at law exists," and therefore, the non-breaching party has a right to seek a court order enjoining the breach.

114.    Furthermore, Plaintiff is entitled to injunctive relief from Defendants' actions constituting violations of the federal Lanham Act, Minnesota Deceptive Trade Practices Act, Uniform Trade Secrets Act, and common law.

115.    The interests of justice require equitable and injunctive relief for the Plaintiff.

116.    Accordingly, Plaintiff respectfully requests that this Court issue an injunction enjoining Defendants' from improperly using, misappropriating, and disclosing Plaintiff's proprietary and confidential information and trade secrets for their own benefit, and from engaging in unfair competition and deceptive trade practices, to the detriment of Plaintiff and in direct violation of the parties' Mutual Nondisclosure Agreement, Plaintiff's ownership rights in said information, and Federal and State laws. Defendants should be ordered to immediately cease and desist their unlawful actions, and further be ordered to turn over to Plaintiff any proprietary and confidential information of Plaintiff still in their possession.

### V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant relief as follows:

1. Issue an injunction enjoining Defendants from improperly using, misappropriating, and disclosing Plaintiff's proprietary and confidential information and trade secrets, and from engaging in unfair competition and deceptive trade practices; and

2.  Order judgment in Plaintiff's favor and against Defendants in an amount to be determined at trial, which amount is in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00), plus statutory interest on all accrued claims, Plaintiffs' costs, disbursements, and attorney fees; and

3.  Such other and further relief as this Court may deem just and equitable.

Dated:  December 30, 2015.                    **CHESTNUT CAMBRONNE PA**

By: _____

Francis J. Rondoni (#121903)
Elizabeth C. Henry (#320675)
Erin F. Musland (#0397118)
17 Washington Avenue North
Suite 300
Minneapolis, MN 55401
Telephone: (612) 339-7300
Fax: (612) 336-2940
frondoni@cclawmn.com
lhenry@cclawmn.com

**ATTORNEYS FOR PLAINTIFF**

VERIFICATION

STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF HENNEPIN          )

    Drew Pearson, in his capacity as the chief executive officer (CEO) of Goodbye

Vanilla, LLC, being first duly sworn upon oath, deposes and says that he is the CEO

and authorized agent of the Plaintiff in the foregoing proceeding; that he has read the

foregoing Complaint and knows the contents thereof; that the same is true of his own

knowledge, except those matters therein stated upon information and belief, and as to

such matters he believes them to be true.

                    I declare under penalty of perjury that everything
I have stated in this document is true and
correct.

Signed this 30 day of December, 2015, in the
State of Minnesota, County of Hennepin.

_____
Drew Pearson, CEO
Goodbye Vanilla, LLC