# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

Goodbye Vanilla, LLC,                                    Case Number: 16-cv-13 (WMW/SER)

Plaintiff,

v.                                                       **REPORT & RECOMMENDATION**

Aimia Proprietary Loyalty U.S., Inc.,

Defendant.

_____

Elizabeth C. Henry, Erin F. Musland, and Francis J. Rondoni, Esqs., Chestnut Cambronne, PA, Minneapolis, Minnesota, for Plaintiff.

William E. Corum and Megan A. Scheiderer, Esqs., Husch Blackwell, LLP, Kansas City, Missouri, for Defendant.

Heather J. Kaiser and Shannon M. McDonough, Esq., Fafinski, Mark & Johnson, PA, Eden Prairie, Minnesota, for Defendant.

_____

STEVEN E. RAU, United States Magistrate Judge

This matter comes before the Court on Defendant Aimia Proprietary Loyalty U.S. Inc.'s ("Aimia") Motion to Strike Plaintiff's Jury Demand ("Motion to Strike") [Doc. No. 50]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. (Order of Referral) [Doc. No. 65]. For the reasons stated below, the Court recommends that the Motion to Strike be granted in part and denied in part without prejudice.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Goodbye Vanilla, LLC ("Goodbye Vanilla"), is a Minnesota limited liability company that provides "marketing and brand development products and services, including consulting services." (Compl.) [Doc. No 1 ¶¶ 8, 15]. Aimia is a corporation that "manages customer loyalty programs and systems" for its clients. (*Id.* ¶ 16). On August 1, 2014, Aimia,

among other entities, received a Request for Proposals ("RFP") from Sony Pictures Entertainment ("Sony"). (*Id.* ¶¶ 2, 17). The RFP was related to a loyalty program for the television show Wheel of Fortune. (*Id.*). Goodbye Vanilla alleges that Aimia needed its "expertise in the entertainment, media, and television industries" to "develop and produce product software" that satisfied Sony's RFP. (*Id.* ¶ 18).

Aimia approached Goodbye Vanilla with an offer to work together to create and submit a response to the RFP "and ultimately pursue a contract with Sony." (*Id.* ¶ 20). Goodbye Vanilla alleges that this was a "joint venture" and that its contribution to the joint venture was "to provide ongoing expertise and consulting services" regarding marketing issues, both in the context of the response to the RFP and during the course of any contractual relationship with Sony. (*Id.* ¶ 21). Goodbye Vanilla also "provided research and advice regarding best practices in the television and entertainment industries, as well as recommendations for improving consumer loyalty programs, engagement and viewership, and developing digital strategies." (*Id.*). Goodbye Vanilla asserts that Aimia agreed to compensate it for work done in preparing a response to the RFP. (*Id.* ¶ 22). Furthermore, if the parties were awarded a contract with Sony, Goodbye Vanilla "would be guaranteed a revenue-generating role in the final agreement with Sony." (*Id.*). The agreed upon revenue-generating role was alleged to be "equivalent to $300,000.00." Goodbye Vanilla claims it accepted the role because Aimia "assured [Goodbye Vanilla] that winning the Sony contract award would open other revenue-generating opportunities," leading to another estimated $500,000.00 in revenue. (*Id.* at ¶ 22). Goodbye Vanilla also asserts that Aimia promised that if the Sony contract were secured, further business opportunities would follow. (*Id.* ¶ 23).

In August 2014, in advance of the parties' preparation of a response to the RFP, they

2

entered into a Mutual Nondisclosure Agreement (the "NDA"). (*Id.* ¶¶ 24–25). The NDA is short; it is only two pages in length, with a third signature page. (NDA, Ex. A, Attached to Compl.) [Doc. No. 1-1]. Generally, the NDA limits the use and disclosure of any "Confidential Information," as defined by the agreement. *See generally* (*id.*). The NDA's definition of Confidential Information is broad. (*Id.* at 1). Specifically, Confidential Information is defined as "including without limitation," the disclosing party's "finances, research, development, business activities, products, services, or technical knowledge." (*Id.*). In addition, Confidential Information includes "any personally identifiable information provided by" a disclosing party, including "without limitation, name, address, phone number, internet address or similar identifying designator associated with communication, or other personal information that could be utilized to identify an individual." (*Id.*). Furthermore, Confidential Information includes "any modifications or derivatives prepared by the Recipient that contain or are based upon Confidential Information of the Disclosing Party."[1] (*Id.*).

Significantly, the NDA is mutual, and the obligations thereunder extend equally to any party to the agreement. *See generally* (*id.* at 1–2). The NDA defines the nature of any disclosure of Confidential Information (*e.g.*, disclosure does not grant any license or ownership rights to the recipient of the information). (*Id.* at 1). The recipient of Confidential Information is bound to "protect the confidentiality" of the information as if it were "its own proprietary and confidential information of like kind, but in no event" may a recipient "use less than a reasonable standard of care." (*Id.*). Confidential Information may be used by the recipient "only in connection" with the

---

[1]     Excepted from the definition of Confidential Information is information that was: (1) known to the recipient before disclosure by the disclosing party; (2) independently developed by the recipient "without reference to" the Confidential Information; (3) acquired by the recipient "from a third party that was not" to the recipient's knowledge "prohibited from disclosing the information; or (4) "that is or becomes publicly available through no breach" of the NDA by the recipient. (*Id.*).

parties' "Business Purpose."[2] (*Id.*). In addition, a recipient must "not disclose the Confidential Information except to its employees and agents who need to know the Confidential Information in order to achieve" the parties' "Business Purpose," "who are informed of the confidential nature of the information," and who are bound by confidentiality obligations "consistent with" the NDA. (*Id.*).

Upon termination of the parties' "Business Purpose" or at the request of the disclosing party, all Confidential Information is required to be returned to the disclosing party. (*Id.*). The parties' obligations under the NDA "continue in full force and effect for a term of five (5) years from" the NDA's effective date, which is the earlier of: (1) the date on which Confidential Information is first disclosed to the other party under the agreement, or (2) the date "upon which the last party executed the" NDA. (*Id.* at 2).

The NDA provides that it "does not constitute a commitment by either party to disclose any information or to acquire or provide any product, service, or asset," and further provides that it does not "create or imply any partnership or joint venture" or create an agency relationship between the parties. (*Id.*). Nonetheless, the NDA entitles a disclosing party to pursue equitable relief, "in addition to all other rights it may have," if a recipient of Confidential Information breaches the NDA. (*Id.*). The NDA specifies that it constitutes "the entire understanding between the parties as to Confidential Information provided pursuant to" the NDA and that it cannot be modified except by written amendment executed by both parties. (*Id.*). It further provides that the parties' consent to jurisdiction in Minnesota "in connection with any dispute between the parties arising out of [the NDA] or pertaining to the subject matter" thereof. (*Id.*). In the final paragraph,

---

[2]     As used in the NDA, "Business Purpose" refers to the parties' intent "to discuss the formation of a business relationship with each other," and the possibility that the parties' "may form such a business relationship, and may participate in business activities during such business relationship." (*Id.*).

titled "Interpretation and Enforcement," the NDA states: "**EACH PARTY EXPRESSLY WAIVES ALL RIGHTS TO A TRIAL BY JURY**." (*Id.*).

Goodbye Vanilla alleges that it relied on Aimia's promises, and after execution of the NDA, "immediately" began preparing a response to Sony's RFP, spending "a significant amount of time" and money from "approximately August 15, 2014, to December 4, 2014." *See* (Compl. ¶ 26). Goodbye Vanilla's contributions to the development of the response to the RFP included providing a television reference, conducting "ad-hoc research studies," educating Aimia's staff and consultants regarding the television industry, as well as using its "industry contacts" to engage third party consultants and conduct interviews of executives in the entertainment industry. (*Id.* at ¶¶ 28, 30–31, 34–35).   Goodbye Vanilla further alleges that it responded to numerous requests from Sony and "collaborated with" Aimia "to develop recommendations for Sony." (*Id.* ¶ 33). "On December 4, 2014, the parties were notified that they had been awarded the Sony contract." (*Id.* ¶ 37). Goodbye Vanilla alleges that its contributions were "critical to" Aimia's success in securing the contract. (*Id.* ¶¶ 38–40).

After the award of the Sony contract, issues arose between the parties. *See* (*id.* ¶¶ 41–53). Goodbye Vanilla alleges that although the parties "had agreed to act jointly, present[ed] their proposal to Sony as co-partners," and intended to work as partners if awarded the contract, Aimia later took various intentional steps to "squeeze" Goodbye Vanilla "out of the final Sony deal." (*Id.* ¶ 45). *See also* (*id*. ¶ 41).   For example, Aimia became a "single point of contact and billing for Sony," presented Goodbye Vanilla's contributions that "included valuable proprietary information and work product" as though they were Aimia's contributions, withheld information from Goodbye Vanilla, stopped providing timely responses to Goodbye Vanilla's communications, and cut Goodbye Vanilla off from what had previously been shared

information and resources.  (*Id.* ¶¶ 41–46). On March 13, 2015, Aimia told Goodbye Vanilla to put its work on the Sony contract "on hold," but Aimia "continued to work with Sony" and excluded Goodbye Vanilla from those dealings. (*Id.* ¶¶ 47–48).

Goodbye Vanilla states that in a letter dated March 25, 2015, Aimia "admitted . . . that they . . . agreed to work as co-partners with" Goodbye Vanilla in creating and submitting the response to Sony's RFP and "had promised [Goodbye Vanilla] a revenue-generating role in the event they were awarded" the contract, but that Aimia paid Goodbye Vanilla only about $17,000.00, representing a "partial reimbursement for out-of-pocket expenses." (*Id.* ¶ 50). In May 2015, Aimia informed Goodbye Vanilla that Sony would not contract for Goodbye Vanilla's services as Aimia suggested in response to the RFP (*Id.* ¶ 51). Aimia also repeated its instruction that Goodbye Vanilla put any work for Sony "on hold." (*Id.*). Goodbye Vanilla asserts, however, that Aimia subsequently brought on new consultants and entered into additional contracts with Sony. (*Id.* ¶ 52). Goodbye Vanilla asserts that Aimia has "used, and continue[s] to use without any authorization or approval," Goodbye Vanilla's "proprietary information, industry expertise, and work product in their dealings with Sony and others." (*Id.* ¶ 49); *see also* (*id.* ¶ 53) (alleging that Aimia has and continues to "improperly use and disclose" Goodbye Vanilla's "proprietary and confidential information for their own benefit").

## B.    Procedural Background

Goodbye Vanilla filed its complaint against Aimia on January 5, 2016, and demanded a jury trial. (Compl. at 1). Aimia answered the complaint on January 27, 2016.[3] (Aimia's Answer) [Doc. No. 7].

---

[3]     A different entity, Aimia, Inc., was previously a defendant in this lawsuit. Aimia, Inc. moved to dismiss the claims against it for lack of personal jurisdiction. (Mot. to Dismiss for Lack of Personal Jurisdiction) [Doc. No. 19]. The Honorable Wilhelmina M. Wright granted the

The Complaint asserts nine counts: Count I asserts a claim for unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); Count II asserts a claim for violation of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*; Count III asserts a claim for misappropriation of trade secrets in violation of the Uniform Trade Secrets Act, Minn. Stat. § 325C.01, *et seq.*; Count IV asserts a claim for breach of contract based on Aimia's alleged breach of the NDA; Count V asserts a claim for breach of a joint venture agreement; Count VI asserts that Aimia breached its fiduciary duties as a joint venturer; Count VII asserts a promissory estoppel claim; Count VIII asserts an unjust enrichment claim; and Count IX seeks injunctive relief based on "irreparable harm" suffered as a result of Aimia's "breach of the parties' [NDA], and Federal and State laws." (Compl. ¶¶ 54–116). Goodbye Vanilla seeks an injunction preventing Aimia "from improperly using, misappropriating, and disclosing Plaintiff's proprietary and confidential information and trade secrets, and from engaging in unfair competition and deceptive trade practices," and also seeks money damages. (*Id.* at p. 29–30).

On June 17, 2016, Aimia filed the present Motion to Strike. (Mot. to Strike). The Court held a hearing on the motion on July 15, 2016, and took the motion under advisement, making the issues in the motion ripe for consideration. (Minute Entry Dated July 15, 2016) [Doc. No. 64].

## II.   DISCUSSION

The issue before the Court is the validity and scope of the pre-litigation jury trial waiver contained within the NDA, which was executed between Goodbye Vanilla and Aimia prior to the submission of their response to the RFP from Sony. *See generally* (Compl.); (Mem. of Law in Supp. of Mot. to Strike, "Mem. in Supp.") [Doc. No. 52]; (Mem. of Law in Opp'n to Mot. to

---

motion to dismiss on July 12, 2016. (Order Granting Aimia Inc.'s Mot. for Lack of Personal Jurisdiction) [Doc. No. 59].

Strike, "Mem. in Opp'n") [Doc. No. 55]. Aimia moves to strike Goodbye Vanilla's jury demand under Federal Rule of Civil Procedure 39,[4] relying on the jury trial waiver provision contained in the NDA. (Mem. in Supp. at 4–12).

### A.      Legal Standard

"The right to a jury trial in the federal courts is governed by federal law." *La Parilla, Inc. v. Jones Lang LaSalle Americas, Inc.*, No. 04-cv-4080 (MJD/AJB), 2006 WL 2069207, at *11 (D. Minn. July 26, 2006) (Davis, J.) (citing *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir.1998)). The Seventh Amendment provides that in "suits at common law, where the value in controversy . . . exceed[s] twenty dollars, the right of trial by jury shall be preserved." U.S. Const. Amend. 7. But "[t]he constitutional right to a jury trial may be waived by parties' agreement." *LaParilla*, 2006 WL 2069207, at *11. "A waiver is effective if the party waiving the right does so knowingly and voluntarily." *Id* at *12. (citing *Brookhart v. Janis*, 384 U.S. 1, 4–5 (1996)).

However, "'[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'" *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 501 (1959) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)); *see also  Minn. Mining & Mfg. Co. v. Shurtape Techs., Inc.*, No. 98-cv-2134 (MJD/JGL), 2002 WL 1000089, at *2 (D. Minn. Mar. 14, 2002) (Davis, J.) (noting that a "request to take an issue away from the jury must be closely scrutinized"). "Because the right to a jury trial is a fundamental

---

[4]      "A motion to strike a jury demand is properly made under Rule 39 . . . ." *Shaw v. Prudential Ins. Co. of Am.*, No. 10-3355-S-CV-DGK, 2012 WL 432874, at *7 (W.D. Mo. Feb. 9, 2012); *see also* Fed. R. Civ. P. 39(a)(2) ("The trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.").

right, there is a presumption against waiver." *LaParilla*, 2006 WL 2069207, at \*12 (citing *Aetna Ins. Co. v. Kennedy ex rel Bogash*, 301 US 389, 393 (1957)); *cf. Nw. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 373 F.2d 136, 142 (8th Cir. 1967) (concluding that acceptance of a dispute resolution forum selection clause was implied waiver of jury trial that was voluntary and knowing). In *LaParilla*, the Honorable Michael J. Davis noted a circuit split "as to which party bears the burden of showing that a contractual waiver was knowing and voluntary," but concluded that the party asserting the waiver bears this burden, "as this is the party that seeks its benefit." *La Parilla*, 2006 WL 2069207, at \*12.

Courts consider several factors when determining whether a pre-litigation waiver of a jury trial is knowing and voluntary and therefore enforceable. *Id.* Specifically, courts consider: (1) whether "the waiver provision is on a standardized form agreement or newly-drafted document"; (2) whether the provision was "in fine print or in large or bold print"; (3) whether the provision was set off in its own paragraph; (4) whether the provision was "in a take-it-or-leave-it or negotiated contract"; (5) whether the contract is long or short; (6) whether the waiving party was represented by legal counsel; (7) whether the waiving party was "a sophisticated business person"; (8) whether there was "manifestly unequal . . . bargaining power" between the parties; and (9) whether the waiving party "had an opportunity to review the contract." *Id.* (citing *Coop. Fin. Ass'n, Inc. v. Garst*, 871 F. Supp. 1168, 1171 (N.D. Iowa 1995)).

**B.    Analysis**

As an initial matter, the Court notes that the Motion to Strike and the parties' arguments focus exclusively on whether the jury trial waiver in the NDA is enforceable, and, if so, to which claims the waiver applies. *See* (Mem. in Supp.); (Mem. in Opp'n); *see also* (Reply to Mem. in Opp'n) [Doc. No. 60]. The parties have not raised any issues regarding whether Goodbye Vanilla

has, in the first instance, the right to a jury trial as to each of the claims as pled in the Complaint. *See* (Mem. in Supp. at 4–11) (assuming without analysis that Goodbye Vanilla had a waivable right to a jury trial as to "all claims" it asserts against Aimia); (Mem. in Opp'n at 7) (stating without analysis that Goodbye Vanilla "is entitled to a jury trial as a matter of right on all of the claims in its Complaint").

As noted, whether a party has a right to a jury trial in the federal courts is governed by federal law, and this inquiry involves various considerations not addressed by the parties. *See, e.g.*, *Incompass IT, Inc., v. XO Commc'ns. Servs., Inc.*, 719 F.3d 891, 896 (8th Cir. 2013) ("[T]he characterization of [a] state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law. Thus, for Seventh Amendment purposes, a promissory-estoppel claim may be considered equitable or legal, depending on the context . . . ." (alterations in original) (citation and internal quotation marks omitted)); *Kampa v. White Consol. Indus., Inc.*, 115 F.3d 585, 586 (1997) (stating that the "Seventh Amendment right to a jury trial extends to statutory causes of action, so long as the statute allows, and the plaintiff seeks, at least in part a legal remedy" (alteration and internal quotation marks omitted)). Because Aimia's motion and the parties' briefing does not address these issues, and because of the recommendation this Court makes, this Court will not address those issues either. Instead, the Court addresses only the issues presented by the parties. As discussed below, the Court concludes that the NDA's jury trial waiver is enforceable and applies to several counts in Goodbye Vanilla's Complaint. For those affected claims, the Court assumes for purposes of analysis that Goodbye Vanilla had a jury right in the first instance, but concludes that this right has been waived. As to the other counts in the Complaint, the Court concludes that the record is not sufficiently developed to determine the applicability of the NDA's jury trial waiver. Upon

further development of the record, the parties should evaluate whether Goodbye Vanilla has the right to a jury trial as to those counts before proceeding to consider whether a waiver has occurred.

### 1.    Enforceability

Considering the relevant factors described in *LaParilla*, the Court concludes that the jury waiver in the NDA is enforceable. While the waiver is contained within what appears to be a standardized form and is not set off in its own paragraph, it is the final sentence on page two of the NDA, and it is in bold print and capital letters. (NDA at 2); (Email from Laurie Riepe ("Riepe") to Chris McLaren, Attached to Second Decl. of Drew Pearson, "Pearson Decl.") [Doc. No. 56-1 at 7] (Aimia employee noting that "[l]egal will want to populate . . . the NDA template"). And as stated earlier, the NDA is a short, two page document with a third signature page. (NDA at 1–3). In addition, the standardized nature of the NDA bears little on the Court's analysis, as Goodbye Vanilla's Chief Executive Officer and sole member, Drew Pearson, ("Pearson") was told that if he had "any feedback" regarding the NDA, he should "track [his] changes and send" it back to Aimia. *See* (Pearson Decl. ¶ 1); (Email from Riepe to Drew Pearson, Attached to Pearson Decl.) [Doc. No. 56-1 at 5] (Aimia employee telling Pearson, "[i]f you do happen to have feedback to the NDA, please track your changes and send my way."). Pearson declined Aimia'a invitation to provide feedback and redlined changes to the NDA, and instead, returned the signed NDA, noting that he "reviewed the document." (Email from Pearson to Riepe, Attached to Pearson Decl.) [Doc. No. 56-1 at 4]. These exchanges demonstrate that Goodbye Vanilla reviewed the contract and had an opportunity to negotiate regarding the terms of the NDA, undermining Goodbye Vanilla's arguments to the contrary. *See LaParilla*, 2006 WL 2069207, at *12; (Pearson Decl. ¶ 5); *cf.* (Mem. in Opp'n at 10, 11–12) (arguing that Goodbye

Vanilla "had virtually no power to change any of the terms" of the NDA).

While Pearson asserts that it was his understanding that Goodbye Vanilla could not engage with Aimia regarding the RFP process until it signed the NDA containing the jury waiver and that he did not seek legal advice or representation in executing the agreement, Goodbye Vanilla, acting through its CEO and sole member, is a sophisticated party, and the record before the Court does not demonstrate that the parties had manifestly unequal bargaining power. *See* (Pearson Decl. ¶¶ 1, 5–6). In fact, it was **Aimia** that sought out **Goodbye Vanilla** because of its industry knowledge and expertise. *See generally* (Compl.); *see also* (Mem. in Opp'n at 2–3) ("Recognizing its inability to sufficiently respond to the RFP on its own, Aimia approached Plaintiff with an offer to work jointly to prepare and submit a joint proposal to Sony's RFP . . . .").

Goodbye Vanilla argues that Pearson's email to Aimia, in which he returned a signed copy of the NDA, demonstrates that the parties' bargaining power was manifestly unequal. In particular, Goodbye Vanilla states that Pearson "pointed to Section 8 of the [NDA] and suggested that a work guarantee should be addressed, but Aimia never responded to his suggestion." (Mem. in Opp'n at 4–5). But Pearson's email did not, in fact, propose any specific changes to the NDA, which Pearson had already signed and returned to Aimia. *See* (Email from Pearson to Riepe). Rather the email stated:

> Hi Laurie-
>
> Thanks for getting us the NDA so quickly. I've signed and attached the NDA.
>
> As a **next step**: We reviewed the documentation and had only one comment – around bullet 8—specifying a guarantee of work performed. **Recognizing this point may be specified in a contract, MSA or other legal document instead of an NDA**, we at Goodbye Vanilla would like a mutual guarantee that if both parties spend time and resources in a new business pitch or with an existing project, both parties should be guaranteed to be on the project fully through the

> end of the project term as specified in a proposal, pitch deck or contract and should be compensated accordingly.
>
> Thanks!

(*Id.*) (emphasis added). That is, rather than show that Pearson had little or no bargaining power and that his proposed changes to the NDA were ignored by Aimia, the email demonstrates that a provision of the NDA prompted Pearson to begin negotiating the terms of additional agreements and that he had sufficient business savvy to recognize that his proposal for a guarantee of work performed may be contained in an agreement other than an NDA. This email demonstrates that Goodbye Vanilla was able to assert its position in the course of negotiations with Aimia and further demonstrates Goodbye Vanilla's sophistication. *See LaParilla*, 2006 WL 2069207, at *12 (concluding that waiver was enforceable when the terms of the waiver were clear, the provision was in capital letters, the individual that executed the document was "an experienced businessman," and where there "was no evidence of manifest inequality of bargaining power.").

Based on an evaluation of the *LaParilla* factors, this Court concludes that the jury trial waiver in the NDA was made by Goodbye Vanilla knowingly and voluntarily and is therefore enforceable.

### 2.     Scope

Having concluded that the jury waiver in the NDA is enforceable, the Court must consider the scope of the waiver. Aimia argues that Goodbye Vanilla's jury waiver applies to "all claims now asserted against Aimia." (Mem. in Supp. at 9–11). Goodbye Vanilla argues, however, that the waiver does not apply to all claims in its Complaint, noting that the NDA "does not address the specifics of the parties' joint venture in responding to Sony's RFP, the parties' respective roles in the joint venture, revenue sharing, or the Sony contract award." (Mem. in Opp'n at 13–14).

As discussed above, Goodbye Vanilla's Complaint essentially alleges that Aimia, after entering into the NDA, exploited its business relationship with Goodbye Vanilla, secured a contract with Sony, and eventually took steps to cut Goodbye Vanilla out of any ability to profit from the information and presentations the parties jointly submitted to Sony and that resulted in an agreement between Aimia and Sony. *See generally* (Compl.). Goodbye Vanilla alleges that Aimia did so despite guarantees of "a revenue-generating role equivalent to" $300,000.00 and despite assurances of an additional $500,000.00 in business opportunities. *See, e.g.*, (*id.* ¶¶ 22, 85, 105).

The Complaint—in its introductory paragraphs, as well as in its paragraphs containing substantive factual allegations—is replete with references to Aimia's alleged wrongful use of Goodbye Vanilla's "words, terms, names, symbols or devices," "goods and services," "confidential information," "trade secrets," proprietary information, and work product. *See, e.g.*, (Compl. ¶¶ 5, 6, 24, 25, 49, 53, 55, 71, 78). The Complaint also references the NDA repeatedly and relies heavily on Aimia's alleged misuse of information derived from Goodbye Vanilla as a basis for Aimia's liability. *See, e.g.*, (*id.* ¶¶ 70–74, 76–82). In particular, Goodbye Vanilla's Lanham Act claim (Count I) alleges that Aimia has "used and continue[s] to use [Goodbye Vanilla's] words, terms, names, symbols, or devices, or a combination thereof, in such a way that it is likely to cause confusion, or cause a mistake or to deceive" others in the marketplace. (*Id.* ¶ 55). This alleged misuse of information falls squarely within the scope of the NDA's limitation on use of Confidential Information. *See* (*id.*); (NDA at 1) (defining "Confidential Information" as "**including without limitation**" the disclosing party's "finances, research, development, business activities, products, services, or technical knowledge," "any personally identifiable information provided by" a disclosing party, including "without limitation, name, address, phone

number, internet address or similar identifying designator associated with communication, or other personal information that could be utilized to identify an individual," and "any modifications or derivatives prepared by the Recipient that contain or are based upon Confidential Information of the Disclosing Party," stating that the a recipient can only use Confidential Information "in connection with" the parties' "Business Purpose," and providing that disclosure does not result in a license to any trade secret or "any other intellectual property" (emphasis added)). Similar considerations apply to Counts II and III, alleging a Minnesota Deceptive Trade Practices Act claim—merely a state law corollary to Goodbye Vanilla's Lanham Act claim—and a misappropriation of trade secrets claim under Minnesota law. *See, e.g.*, (Compl. ¶¶ 60–74). Both Counts involve Aimia's alleged misuse of information obtained by virtue of the NDA, and therefore fall within the scope of the jury waiver. Likewise, Count IV alleges Aimia's breach of the NDA based on Aimia's "improper[] use and disclos[ure]" of Goodbye Vanilla's "proprietary and confidential information . . . in direct violation of the" NDA, and Count IX seeks injunctive relief preventing Aimia from "improperly using, misappropriating, and disclosing" Goodbye Vanilla's "proprietary and confidential information and trade secrets . . . , and from engaging in unfair competition and deceptive trade practices" in violation of the NDA, and federal and state laws. (*Id.* ¶¶ 78, 116). These claims also fall within the scope of the NDA's jury trial waiver. (*See id.* ¶¶ 78, 116); (NDA at 2). The Court therefore recommends granting the Motion to Strike with respect to Counts I, II, III, IV, and IX of the Complaint.

But the Complaint also discusses other behavior by Aimia as a basis for liability, and a fair reading of the Compliant demonstrates that Goodbye Vanilla's other claims as pled are based in significant part on these other allegations. *See* (Compl. ¶¶ 87, 93, 97, 101, 105). Importantly,

Goodbye Vanilla's allegations suggest that additional agreements were reached by the parties and that Aimia took various actions in breach of those agreements and associated obligations. *See* (*id.*). Given the rather early stage of this litigation and the minimal information before the Court at this time, the relationship between the jury waiver in the NDA and those additional agreements and obligations (the existence or validity of which Aimia may dispute) is not yet clear.  In light of the limited record and given the caution with which the Court must proceed when finding waiver of the right to a jury trial, the Court concludes that it does not have enough information to make a meaningful and fully-informed recommendation as to whether the jury waiver contained in the NDA applies to Counts V through VIII of the Complaint. The Court therefore recommends denying without prejudice the Motion to Strike as it relates to Counts V, VI, VII, and VIII of the Complaint.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Aimia Proprietary Loyalty U.S. Inc.'s Motion to Strike Plaintiff's Jury Demand [Doc. No. 50] be **GRANTED in part** and **DENIED in part without prejudice** as described herein.


Dated: September 8, 2016

                                             *s/Steven E. Rau*
                                             STEVEN E. RAU
                                             United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.